# ILLINOIS OFFICIAL REPORTS

## Appellate Court

**People v. Tamayo, 2012 IL App (3d) 100361**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MIGUEL A. TAMAYO, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-10-0361 |
| Rule 23 Order filed<br>Motion to publish allowed<br>Opinion filed<br>Rehearing denied | February 28, 2012<br><br>April 13, 2012<br>April 13, 2012<br>April 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first degree felony murder, aggravated battery and mob action were upheld over his contentions that he was not proved guilty of felony murder beyond a reasonable doubt and that the felony murder conviction should be vacated on the ground that the acts of the underlying mob action felony were inherent in the murder, since the evidence established that defendant and two others had an altercation with two men, one man was killed and the other was injured, that evidence was sufficient to sustain defendant's conviction for felony first degree murder based on mob action, and because the acts that formed the mob action were independent of, and involved a different felonious purpose than, the acts that caused the death, the mob action was a proper predicate for the felony murder conviction. |
| Decision Under Review | Appeal from the Circuit Court of Whiteside County, No. 09-CF-281; the Hon. Stanley B. Steines, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|

| Counsel on Appeal | Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant. |
|---|---|
| | Gary L. Spencer, State's Attorney, of Morrison (Terry A. Mertel and Mark A. Austill, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

| Panel | JUSTICE O'BRIEN delivered the judgment of the court, with opinion. Presiding Justice Schmidt and Justice Wright concurred in the judgment and opinion. |
|---|---|

**OPINION**

¶ 1    Defendant Miguel Tamayo was convicted following a bench trial of first degree felony murder, aggravated battery, and mob action, and sentenced to a 20-year term of imprisonment. He appealed his conviction. We affirm.

¶ 2                                    FACTS

¶ 3    Defendant Miguel Tamayo was charged with first degree murder, aggravated battery, and mob action. 720 ILCS 5/9-1(a)(3), 12-4(a), 25-1(a)(1) (West 2008). The indictment alleged that on June 20, 2009, Tamayo, knowingly and by the use of force and violence and without lawful justification, while acting together with Luis Carranza and Jose Antonio Reyes Gomez, participated in a fight in which Rodolfo Luevano and Juan Lopez were beaten and Lopez was killed (count I); that Tamayo caused great bodily harm to Luevano by striking him on the face and head (count II), and disturbed the peace while acting with Carranza and Reyes Gomez by striking Luevano (count III). Codefendant Carranza was granted use immunity by the trial court immediately prior to trial. A bench trial took place at which the following evidence was presented.

¶ 4    Matt Stombaugh witnessed the incident. He was behind his house smoking around 2 a.m. on June 20, 2009. He heard loud voices and bottles breaking. He walked to the front of his house. He saw a man "bouncing" the head of another man on the ground on the south side of the street. On the north side of the street, about 15 to 20 feet away from the other altercation, he saw a man lying on the ground. One man was punching and kicking him and another man appeared to be swinging something at him, as well as punching and kicking him. He could not see if the second person had anything in his hand but it looked like he was

using a swinging motion in hitting the victim. He did not see either Lopez or Luevano hit or kick their attackers. After he yelled at the attackers, they "all kind of grouped up for a split second it seemed like," and then ran east. The man from the south side of the street got up, staggered toward the other man, and asked Stombaugh to help his friend. Both men were bleeding from the head and face and the man on the north side of the street was gasping and spitting up blood. He called 9-1-1 on his cellular phone. Stombaugh admitted he was intoxicated when he witnessed the beatings. He also admitted the State's Attorney's office dismissed a domestic battery charge against him six days before he testified, although the dismissal was not in exchange for his testimony. He also admitted he had a 2006 conviction for unlawful possession of a weapon by a felon.

¶ 5    Rodolfo Luevano testified that he and longtime friend Lopez began drinking at 6 p.m. on June 19, 2009. They drank at a local tavern until 1 a.m. and he then took Lopez home. Lopez shared an apartment with Jose Romo and a man he knew only as Antonio. Lopez called him 20 to 30 minutes later and asked him to return to Lopez's apartment immediately. When he arrived at the apartment, he saw Lopez on the sidewalk with Reyes Gomez, Tamayo, and a third man he did not know. As the group began walking west, Luevano joined them. Reyes Gomez and Lopez were arguing. Reyes Gomez pushed Lopez. Tamayo took off his belt and began swinging it. After Luevano told Tamayo not to get involved, Tamayo hit him with his belt. He saw Lopez and Reyes Gomez, who were about 25 to 30 feet away, hitting each other. He did not see anyone else hit Lopez. Luevano chased Tamayo, who again swung at him with the belt. He was hit with the buckle. He saw Lopez fall to the ground and Reyes Gomez continue to punch him. He ran at Reyes Gomez and punched and kicked him. He was then hit in the back of the head and lost consciousness. When he awoke, he was on the ground. His head and face hurt and he noticed a lot of blood. He saw Lopez lying on the ground and people running away. He got up and went to Lopez, who was bleeding from the nose and mouth.

¶ 6    Luis Carranza testified under use immunity. He and Tamayo were good friends. Tamayo lived with his girlfriend's sister. He and Tamayo were both friends with Reyes Gomez, whom they visited on June 19, 2009, at his apartment. They arrived around 9:30 p.m., played PlayStation and drank beer. They later went across the street for several hours to socialize, then returned to the apartment. Juan Lopez was there. Carranza did not know him. Lopez asked Reyes Gomez about the rent and said Reyes Gomez would have to leave if he did not pay. Lopez and Reyes Gomez both sounded mad. He and Tamayo went to the porch, where Reyes Gomez joined them and argued with another tenant of the building. Lopez came out on the porch with Luevano. He did not know Luevano. Lopez and Luevano "wanted to fight." They spoke to Reyes Gomez, and Lopez swung at him, missed, and fell off the porch. Lopez appeared intoxicated. Lopez got up and walked toward the street with Luevano and Reyes Gomez. Luevano and Lopez were trying to hit Reyes Gomez. He and Tamayo tried to separate the three men and calm them down. Luevano threatened Tamayo, stating he knew where Tamayo lived and worked. Luevano then tried to hit Tamayo and also tried to hit him after he attempted to calm Luevano down. He hit Luevano. He could not see Reyes Gomez and Lopez. After Luevano again tried to hit him, Tamayo took off his belt and hit Luevano with it. Luevano at some point fell to the ground, where he and Tamayo kicked him. As he

walked away, he saw Lopez on the ground and Reyes Gomez standing near him. He was not aware Lopez was badly injured. Neither he nor Tamayo hit or kicked Lopez. After the altercation, he retrieved his computer speakers from Reyes Gomez's apartment and walked home. Reyes Gomez came with him and spent the night at his house.

¶ 7    Sterling police sergeant Robert Allen responded to a 9-1-1 call at 2:15 a.m., on June 20, 2009. He found Juan Lopez lying in the street, bleeding and gasping for air. Rodolfo Luevano was standing near Lopez. He noticed a strong odor of alcohol in the area. Witness Stombaugh approached and told him three suspects ran east. Stombaugh had slurred speech and appeared to be intoxicated. After Lopez was taken to the hospital by ambulance, Allen was directed 30 feet west of Lopez's body, where blood was pooled. He noticed glass fragments, including pieces from a Chivas Regal bottle, on the sidewalk and curb. Sterling police officer Brad Barron arrived at the scene at 2:45 a.m. on June 20. He saw two pools of blood about 40 feet apart. He later questioned Luevano at the hospital. Based on the information received from Luevano, he went to Tamayo's apartment. Tamayo, who was asleep when Barron arrived, was dressed only in his underwear. There were no injuries to his body and he did not appear to be in physical distress. He took Tamayo into custody and interviewed him at the police station. The interviews were taped and played in open court. He then returned to the hospital and interviewed Luevano again. Luevano picked Tamayo, Reyes Gomez, and Carranza out of photo arrays. Luevano said that Tamayo hit him with a belt and that Reyes Gomez hit Lopez. He also interviewed Carranza and did not observe that he was injured or in physical distress.

¶ 8    One of the doctors who treated Luevano in the emergency room stated that Luevano's injuries included five facial bone fractures, a cut below his right eye requiring four stitches, a cut at the back of his scalp requiring four staples, and injuries to his tailbone. His facial injuries could have been caused by a single punch or kick. Luevano's serum blood alcohol level was 0.164. He told doctors he drank a 12-pack of beer. Luevano was admitted to the hospital and released the following day. The doctor who treated Lopez in the emergency room stated Lopez was in cardiac arrest on arrival, with severe facial and head trauma. He had significant facial swelling and multiple facial abrasions. He was bleeding from the nostrils and ears. Lopez was unconsciousness and unresponsive, not breathing on his own, and without a pulse. He was subsequently pronounced dead.

¶ 9    The forensic pathologist who performed an autopsy on Lopez stated that Lopez died from cardiac arrhythmia caused by a physical altercation. He observed Lopez had fresh external injuries, including facial contusions and hemorrhaging and abrasions on his body, including a linear abrasion on his left arm. The left arm abrasion would have been caused by a blunt object dragging across the skin, although he could not rule out that an impact was not associated with the injury. An internal examination revealed hemorrhaging in two areas under his scalp and a hemorrhage in his brain consistent with an acute stroke. The examination also revealed that Lopez suffered from severe cardiac enlargement, and moderate to severe coronary artery disease, congestion and edema of the lungs. In the pathologist's view, strenuous activity could have led to Lopez's death. Lopez's blood alcohol level at the time of death was 0.173.

¶ 10    Tamayo testified in his own behalf. Reyes Gomez invited him over on June 19. Tamayo

brought Carranza. They played PlayStation and then went across the street to the neighbor's. Tamayo had a beer there. Reyes Gomez argued with some men and they broke bottles in the street. He, Carranza and Reyes Gomez returned to Reyes Gomez's apartment several hours later. Lopez and Romo were there. Tamayo did not know them. Lopez and Reyes Gomez argued about rent money. He and Carranza went out on the porch about 2 a.m. First Reyes Gomez, and then Lopez and Luevano, joined them. Lopez, who appeared to be drunk, swung at Reyes Gomez, missed and fell. Reyes Gomez and Luevano walked into the front yard, where Lopez joined them. Luevano and Lopez tried to push Reyes Gomez and backed him up into the street. He and Carranza tried to stop the fight, separating the other men. Luevano said, "You want to fight, too?" Tamayo said he was trying to stop the fight, but Luevano tried to hit him and Carranza, who hit Luevano and caused him to fall to the ground. He and Carranza kicked Luevano.

¶ 11     He was not aware of what was happening between Lopez and Reyes Gomez, but later saw Reyes Gomez kick Lopez, who was lying on the ground. He did not see anyone else hit Lopez. He, Carranza, and Reyes Gomez returned to Reyes Gomez's apartment, where Carranza retrieved his computer speakers and put them in Reyes Gomez's car. He put his belt in the car and then walked home. Tamayo admitted he lied to the police during his interrogation. He first told them he had gone directly home from work on June 19, then said he was in the area of the fight but did not participate in it, then said Luevano took his belt and that Luevano and Lopez tried to stab him with broken bottles, and then said he left while the others were still fighting. He explained he lied because he was afraid to lose his children, girlfriend, and job, and that he was fearful of immigration.

¶ 12     The trial court found Tamayo guilty of first degree murder, aggravated battery, and mob action. The trial court determined that Stombaugh was a credible witness, that Tamayo struck Lopez with the belt; that there was one, not two, street fights; that Lopez and Reyes Gomez set the chain of events into motion when they argued about the rent; that Tamayo set into motion a further chain of events by participating in the fight; that a reasonable person could foresee that Lopez would die as a result of the beating; and that Lopez's death was a direct and foreseeable consequence of a chain of events set into action by Tamayo's participation in a mob action. Tamayo filed a motion for a new trial, arguing that the State did not prove him guilty beyond a reasonable doubt of felony murder and that the mob action conviction cannot serve as the predicate felony. The trial court denied Tamayo's motion, entered a conviction on only the felony murder charge, and imposed a 20-year sentence. Tamayo appealed.

¶ 13                                    ANALYSIS

¶ 14     Tamayo raises two issues on appeal: whether he was proved guilty beyond a reasonable doubt of first degree felony murder and whether his conviction for felony murder must be vacated because the acts of the underlying mob action felony were inherent in the murder.

¶ 15     The first issue is whether Tamayo was proved guilty beyond a reasonable doubt of felony murder. Tamayo argues that because he was involved in a separate fight 20 to 40 feet away from the fight that resulted in the death of Lopez, the evidence was insufficient to prove

felony murder predicated on mob action.

¶ 16      The State has the burden of proving defendant's guilt beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). In considering a challenge to the sufficiency of the evidence, the reviewing court must determine, viewing the evidence in a light most favorable to the prosecution, whether any rational trier of fact could have found beyond a reasonable doubt the crime's essential elements. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact is responsible to determine witness credibility and the weight to be given the testimony, and to make reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). Although entitled to great deference, determinations made by the trier of fact are not conclusive, and we will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Ortiz*, 196 Ill. 2d at 259.

¶ 17      Section 9-1(a)(3) of the Criminal Code of 1961 (Code) provides: "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: *** (3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 2008). The Code defines "forcible felony" as, *inter alia*, "any other felony which involves the use or threat of physical force or violence against any individual." 720 ILCS 5/2-8 (West 2008). The Code defines "mob action" as "the use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law." 720 ILCS 5/25-1(a)(1) (West 2008).

¶ 18      The trial court made specific factual findings in convicting Tamayo, including that Stombaugh was a credible witness and that Tamayo's credibility was diminished. It concluded that Tamayo and his codefendants became the primary aggressors once Lopez and Luevano were on the ground and not responding to the attack. It found that self-defense was not applicable and that Tamayo acted in concert with Carranza and Reyes Gomez and without authority of law in beating the victims when they were on the ground and defenseless. It further found that Tamayo disturbed the peace, noting several calls were made to 9-1-1, including Stombaugh's, Luevano said he was scared for his safety and that of Lopez, and Tamayo caused Luevano great bodily harm. Finally, the trial court found that Tamayo's conduct set in motion a further chain of violence from which a reasonable person could foresee a death result.

¶ 19      Tamayo asserts that the trial court's findings are not supported by the evidence. He maintains that there were two separate fights and that neither he, Carranza, nor Luevano testified that they saw anyone other than Reyes Gomez hit Lopez. He also argues that Lopez's death was not foreseeable or committed in the course of a mob action and that he could not see the fight involving Lopez and Reyes Gomez. Tamayo argues that *People v. Davis*, 213 Ill. 2d 459 (2004), on which the trial court relied in finding mob action as the predicate for felony murder, is distinguishable. According to Tamayo, no rational trier of fact could find that he fought or hit Lopez or that his fight with Luevano contributed to Lopez's death.

¶ 20      Tamayo also complains that Stombaugh's testimony was not credible. However, the trial court expressly found Stombaugh to a credible witness, without interest or bias, and his

testimony to be "truthful and compelling." Stombaugh testified that he saw two individuals, whom he could not identify, standing over Lopez as he lay helpless on the ground. He saw another individual across the street "bouncing" Luevano's head against the curb. Neither victim was fighting back. Although Stombaugh's version of events contradicted the testimony of Tamayo and Carranza, as trier of fact, the trial court was in the best position to determine witness credibility and the weight to be given to their testimony. The trial court stated that it found Tamayo's credibility diminished by the numerous lies he admitted he told during his police interview.

¶ 21    Similarly, as trier of fact, the trial court was responsible to make reasonable inferences based on the evidence. It found that it could reasonably infer, based on the autopsy results and Stombaugh's testimony, that Lopez's injuries were caused, in part, by being struck with a belt. Carranza testified, and Tamayo admitted, that Tamayo used his belt to strike Luevano. Stombaugh observed two people beating Lopez, one of whom appeared to be striking Lopez with some sort of weapon. The trial court stated that Stombaugh's observations regarding the beating of Lopez were too coincidental with the undisputed evidence that Tamayo swung and used his belt to beat Luevano and supported its inference that Tamayo also struck Lopez with his belt. We consider the inference reasonable and corroborated by the evidence. Moreover, as noted by the trial court, it was not necessary for the State to establish that Tamayo beat Lopez. The predicate felony of mob action encompassed Tamayo's conduct as to either Lopez or Luevano.

¶ 22    We do not agree that *Davis* is distinguishable. In *Davis*, the defendant was convicted of first degree felony murder predicated on mob action. *Davis*, 213 Ill. 2d at 462. At trial, the defendant denied hitting the deceased victim but admitted to hitting another individual also engaged in the group fight. *Davis*, 213 Ill. 2d at 467-68. The *Davis* court stated that the State was not required to prove that the defendant struck the victim or that his conduct caused the killing. *Davis*, 213 Ill. 2d at 474. It was sufficient to sustain the felony murder conviction that the predicate felony of mob action was proved beyond a reasonable doubt. *Davis*, 213 Ill. 2d at 474 ("[t]he jury found that defendant acted together with one or more persons without authority of law; knowingly disturbed the public peace by the use of force or violence; and one of the participants in the mob action violently inflicted injury to [the victim]"). Based on the reasoning in *Davis*, we reject Tamayo's contention that Lopez's death was not foreseeable. He, along with Carranza and Reyes Gomez, engaged in an altercation with Lopez and Luevano. Although the facts establish that the events began with the disagreement between Lopez and Reyes Gomez over rent, it escalated when the others, including Tamayo, involved themselves in the dispute. It was not unforeseeable that severe injury and death would result.

¶ 23    To sustain a conviction for felony murder based on mob action, the State had to establish that Tamayo, with at least one other person and without lawful authority, acted together with the use of force or violence to disturb the peace. The evidence demonstrates that Tamayo, Carranza, and Reyes Gomez had spent the evening together and gathered in a group outside Reyes Gomez's apartment building. They backed Lopez onto the street. Tamayo, Carranza and Luevano began fighting among themselves, while Reyes Gomez and Lopez fought 20 to 40 feet away. Arguably, Tamayo also joined Reyes Gomez in beating Lopez. The three

regrouped and fled together. At the point Luevano and Lopez were lying on the ground in defenseless positions, Tamayo and the others became the aggressors and their conduct precluded a self-defense claim. They thus acted without lawful authority. It is undisputed that Tamayo and the others used violence to disturb the peace. Stombaugh testified that he became aware of the fight because he heard bottles breaking and people arguing. Another resident and a passerby also called 9-1-1. Luevano sustained injuries as a result of Tamayo's actions and Lopez was killed. We find that the evidence was sufficient to support the trial court's finding of guilt.

¶ 24    The second issue is whether Tamayo's felony murder conviction must be vacated. Tamayo argues that because his felony murder conviction is based on the same facts alleged in the predicate felony of mob action, his conviction cannot stand. Because this issue involves a question of law, our review is *de novo*. *People v. Davison*, 236 Ill. 2d 232, 239 (2010).

¶ 25    Tamayo relies on *People v. Morgan*, 197 Ill. 2d 404 (2001), and *People v. Pelt*, 207 Ill. 2d 434 (2003), and maintains that they compel that his conviction for felony murder be vacated. In *Morgan*, the supreme court held that "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *Morgan*, 197 Ill. 2d at 447. The *Morgan* court affirmed the appellate court's holding that the predicate felony "must have an independent felonious purpose." *Morgan*, 197 Ill. 2d at 458. In determining whether there was an independent felonious purpose, the court looked at whether the felony murder charge arose from the cause and effect relationship between the predicate felony and the resulting murder. *Morgan*, 197 Ill. 2d at 447. Relying on *Morgan*, the *Pelt* court examined the cause and effect relationship between the underlying offense and the killing. *Pelt*, 207 Ill. 2d at 442. It determined that the act that formed the basis for the predicate felony was the same act underlying the murder charge and did not involve a different felonious purpose. *Pelt*, 207 Ill. 2d at 442. The *Pelt* court held the aggravated battery could not serve as the predicate felony for felony murder charges under the facts of the case. *Pelt*, 207 Ill. 2d at 442.

¶ 26    Both *Morgan* and *Pelt* are distinguishable. In *Morgan*, the predicate felonies were aggravated battery and aggravated discharge of a firearm, and in *Pelt*, the underlying felony was aggravated battery, which caused the victims' death. *Morgan*, 197 Ill. 2d at 444; *Pelt*, 207 Ill. 2d at 436. Here, the felony murder charge was predicated on mob action. As such, we consider *Davis* and *Davison*, cases in which the predicate felony was mob action, controlling. In both cases, the supreme court held that mob action may serve as the predicate felony for felony murder. *Davis*, 213 Ill. 2d at 474; *Davison*, 236 Ill. 2d at 243. In making the determination, the court must consider whether the conduct of the underlying felony involves "an independent felonious purpose" other than the killing. *Davison*, 236 Ill. 2d at 244; *Davis*, 213 Ill. 2d at 474. Where the same evidence is not used to prove both the predicate felony and the murder, the murder conviction may stand. *Davis*, 213 Ill. 2d at 474; *Davison*, 236 Ill. 2d at 242.

¶ 27    In the instant case, the trial court found that Lopez's death was the result of a "direct and foreseeable consequence of a chain of events set into motion by defendant's commission of the offense of mob action." It further found the mob action consisted, in part, of Tamayo's

beating of Luevano, as well as the beating that resulted in Lopez's death. By Tamayo's admission, his beating of Luevano was an act independent of the beating of Lopez by Reyes Gomez. Tamayo testified that he was not aware of the altercation between Lopez and Reyes Gomez when he and Carranza were engaged in the fight with Luevano. He also admitted he did not intend that Lopez die as a result of the altercation. Based on the evidence, we conclude that the acts that formed the mob action were independent of, and involved a different felonious purpose than, the acts that caused Lopez's death. Accordingly, we hold that under the circumstances of this case, the mob action served as a proper predicate for the felony murder conviction.

¶ 28 Based on the foregoing reasons, the judgment of the circuit court of Whiteside County is affirmed.

¶ 29 Affirmed.