**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 150253-U

Order filed June 3, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-15-0253 |
| v. | ) ) | Circuit No. 13-CF-970 |
| MICHAEL D. COSTIC, | ) ) ) | Honorable David A. Brown, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Justice Carter concurred in the judgment.
Justice McDade dissented.

**ORDER**

¶ 1    *Held:*  Based on the facts of this case, the State proved defendant guilty of felony murder beyond a reasonable doubt because the forcible felony of mob action was a legally permissible predicate offense for felony murder. Additionally, trial counsel was not ineffective for failing to seek a jury instruction on the affirmative defense of self-defense to the underlying offense of mob action.

¶ 2    The State charged Michael D. Costic (defendant) with aggravated battery with a firearm and first degree felony murder based on the underlying charge of mob action. Following a jury trial, defendant was convicted of first degree murder, mob action, and aggravated battery with a

firearm. The trial court sentenced defendant to 50 years' imprisonment in the Illinois Department of Corrections on the first degree murder conviction and a consecutive sentence of 17 years' imprisonment for the aggravated battery with a firearm conviction. Defendant appeals his first degree felony murder conviction on the grounds that the State failed to prove defendant guilty beyond a reasonable doubt.

¶ 3                                                    FACTS

¶ 4        On November 12, 2013, the State filed a four-count indictment charging defendant with first degree murder, aggravated battery with a firearm, and two separate counts of mob action. Count I charged defendant with first degree murder pursuant to 720 ILCS 5/9-1(a)(3) (West 2012) and alleged that defendant, without lawful justification, while committing the forcible felony of mob action, shot Treyshawn Blakely (the victim) with a firearm, thereby causing the victim's death. Count II charged defendant with aggravated battery with a firearm pursuant to 720 ILCS 5/12-3.05(e)(1) (West 2012) and alleged that while committing a battery, defendant, without legal justification, knowingly discharged a firearm in the direction of Gerald Embrey, thereby causing an injury to Embrey. Count III was dismissed prior to trial. Count IV charged defendant with mob action pursuant to 720 ILCS 5/25-1(a)(1) (West 2012) and alleged that defendant, without authority of law and while acting together with another person, knowingly disturbed the public peace by the use of force or violence "and caused injury to Embrey by the discharge of a firearm."[1]

¶ 5        Defendant pleaded not guilty to the charges and a jury trial began on January 13, 2015. The State called Peoria police officer Dave Logan to testify. According to Logan's testimony, on April 7, 2013, at approximately 6 p.m., Logan was dispatched to the corner of Butler and Warren

---

[1]720 ILCS 5/25-1(a)(1) (West 2012) does not require the State to prove that any injury occurred. Therefore, this language in the charging instrument may be treated as unnecessary surplusage. *People v. Collins*, 214 Ill. 2d 206, 219 (2005).

Streets in Peoria, Illinois, in response to a report of shots fired and a man down. Upon arrival, Logan witnessed a dead man lying in the street. Two doors down from the location of the deceased victim, Logan came into contact with Allen Fitzpatrick. Fitzpatrick had sustained a facial injury and told Logan that he had been knocked out. Logan indicated that 50 to 75 people were present and that officers took some time to get the scene under control. Once officers controlled the scene, Logan located several rifle casings.

¶ 6    Embrey testified that on April 7, 2013, he was walking on Butler Street when he witnessed more than 10 people fighting in the street at the corner of Butler and Warren Streets. Embrey walked toward the fight and passed defendant and defendant's brother, Marquis Costic, who were standing in their yard a few houses down from the fight. Embrey never saw defendant or Marquis participate in the fight. Embrey stood and watched the fight for a couple of minutes and saw that Fitzpatrick had been knocked out.

¶ 7    Embrey saw his friend, the victim, who was also watching the fight. The victim was not involved in the fight. The victim saw Embrey and the two began walking toward one another. At this point, Embrey heard many "fast" gunshots being fired and watched as one of the shots struck the victim. The victim fell forward onto his face. As Embrey attempted to run from the scene, a bullet struck him in the back part of his left thigh. Embrey could no longer run and someone carried him out of the area. Eventually, Embrey received medical treatment. Embrey did not see a gun or the shooter.

¶ 8    Dishai Beck testified as a State's witness. Beck's testimony indicated that on April 7, 2013, Beck lived on Butler Street. On that date, Beck witnessed a group of more than 10 males arguing as Beck stood on the front porch of her residence. Eventually, a fight broke out. Beck indicated that defendant and Fitzpatrick were involved in an altercation with others. During this

3

altercation, defendant sustained injuries and Fitzpatrick was knocked unconscious. Beck saw defendant run from the fight. Beck assumed defendant was running toward the home he lived in that was also on Butler Street, down the street from Beck's residence. The fight continued after defendant left the area. Then, Beck saw defendant come back toward the fight, which was still in progress. Defendant walked back past Beck's home with Marquis and "another guy." Beck indicated that Marquis had a "big gun" and started firing while defendant stood beside him. Beck saw that the victim was struck by a gunshot and fell in the street. Beck immediately went into the house and called the police.

¶ 9      Two days later, on April 9, 2013, while at the Peoria police station, Beck circled a photo identifying defendant as the shooter, not Marquis. In the photo array, Beck also circled Marquis as the individual following defendant back toward the fight. When questioned about the discrepancies in her testimony, Beck indicated that she did not know who the shooter was, but indicated that her memory would have been better on April 9, 2013.

¶ 10      Cynthia Singleton testified that she witnessed more than 10 people fighting from the front, closed-in porch with Beck. At the beginning of the fight, defendant and one other individual, whom Singleton could not identify, were arguing with several other males. Next, more than one person began hitting defendant. According to Singleton, "a bunch of dudes jumped [defendant]" and also jumped one other male. Singleton did not see defendant leave the fight. After the fight had stopped, Singleton witnessed defendant walking down the street firing a "big gun" "straight ahead" in the direction of the crowd of people who were fighting. Singleton claimed that when the shooting occurred, Singleton was on the porch while Beck was in the house. The police showed Singleton a photo array on April 11, 2013. Singleton identified defendant as the shooter.

4

¶ 11 Peoria police officer Paul Tuttle testified that he was called to the scene on April 7, 2013. Tuttle located one projectile at the scene inside a home. Later, Tuttle transported 21 .223 shell casings, along with fragments from the victim's head, to the Morton crime lab.

¶ 12 Peoria police officer John Williams testified that he was assigned to the crime scene unit on April 7, 2013. Several persons at various addresses called complaining that their homes had been struck by bullets. Williams inspected the homes and collected items from two of the homes. Ultimately, Williams collected a total of 21 shell casings from the scene. Williams collected one shell casing that was a different caliber than the others. Williams informed the jury that a .223 round is associated with the AR-15 family of military-type rifles. Williams testified that he observed several bullet strikes in the ground in a grassy area at the scene which would indicate that several shots were directed toward the ground. Williams cataloged a bullet strike directly above the window of a home, approximately eight or nine feet above the ground. On April 8, 2013, Williams testified that he assisted in the execution of a warrant at 1614 W. Butler Street in Peoria. Officers forced open a large gun safe inside the residence. Inside the safe, officers found a box of .223 rounds which included two live rounds and personal belongings bearing defendant's name.

¶ 13 Dustin Johnson testified as a forensic scientist with the Illinois State Police who specialized in firearms identification. Johnson received the 21 fired shell casings collected at the scene. Johnson indicated that the casings were .223 cartridges, which are high velocity rounds typically used in rifles. Johnson determined that all the casings were fired from the same gun. Johnson also examined a .38-caliber bullet.

¶ 14 Dershonda Branscumb, defendant's ex-girlfriend, testified that she was not present during the shooting on April 7, 2013. Branscumb had no contact with defendant for several weeks after

5

the shooting. Eventually, defendant called Branscumb and told Branscumb that defendant was involved in the shooting. Defendant told Branscumb that defendant did not intend to kill the victim and was sorry.

¶ 15    Robert McMillen testified that he worked for the Peoria police as a violent crime detective on April 7, 2013. During the course of the investigation, McMillen spoke with Beck and showed Beck a photo array on April 9, 2013. Beck identified defendant as the shooter and identified Marquis as the person following defendant back to the fight. McMillen also showed Singleton a photo array. Singleton identified defendant as the shooter.[2]

¶ 16    The State's final witness, Dr. Scott Denton, testified as a coroner's forensic pathologist. Denton stated that the victim had been killed by a gunshot wound to the head. Both the State and the defense rested following Denton's testimony. The trial court denied defense counsel's motion for a directed verdict.

¶ 17    The defense presented the testimony of Kimberly Brock. On April 7, 2013, Brock was visiting her best friend in Peoria. On that date, Brock's friend attempted to drive down Butler Street with Brock in the passenger seat. However, Butler Street was impassible due to a fight involving 20 to 30 individuals occurring in the middle of the road. Out of the corner of her eye, Brock saw two people, one behind the other, moving toward the fight on her right side, including a person with "dreads." Brock heard shooting. Brock did not specifically see a gun, but indicated that shots were being fired "into the crowd," and that she saw somebody get shot. Conversely, Brock testified that she did, in fact, see the shooter run toward the crowd with a gun. Brock phoned the police the next day. Subsequently, detectives met with Brock and asked Brock if she could identify the assailant from a photo array. Based on the photo array administered by law

[2]At this juncture, the parties decided to take the witnesses out of order because the State's final witness, Dr. Scott Denton, was unavailable that day. Therefore, the defense called its two witnesses.

6

enforcement on April 8, 2013, Brock identified Marquis as the shooter and identified defendant as running with Marquis. Later, Brock clarified that she did not see defendant with Marquis while the shooting occurred. However, Brock explained that she saw defendant running with Marquis near Tax Maxx on Western Avenue prior to the shooting. Brock could not identify the second individual standing behind the shooter.

¶ 18        The defense recalled McMillen as a defense witness. McMillen, along with another detective, met with Brock and administered the photo arrays. McMillen said that Brock identified Marquis as the shooter and identified defendant as the person running with the shooter.

¶ 19        During the jury instruction conference, defense counsel objected to the State's proposed jury instruction No. 22 and argued for a jury instruction stating that the jury could only find defendant guilty of mob action if the jury found the injury was caused by means "other than by discharging a firearm." The court did not add "other than by discharging a firearm" as requested by defense counsel. We note that while not an element of the offense of mob action, a finding by the trier of fact that an injury to another resulted from the violence is necessary for sentencing purposes in some mob action cases. 720 ILCS 5/25-1(b) (3) (West 2012).

¶ 20        Following their deliberations, the jury found defendant guilty of first degree murder, mob action, and aggravated battery with a firearm. On January 28, 2015, defendant filed a motion for a new trial. On April 9, 2015, the trial court denied defendant's motion for a new trial and sentenced defendant to 50 years' imprisonment in the Illinois Department of Corrections for first degree murder based on count I, and a consecutive 17-year sentence of imprisonment for aggravated battery with a firearm, based on count II. The trial court did not impose a sentence on count III following the jury's guilty verdict on that count. On April 10, 2015, defendant filed a

motion to reconsider the trial court's sentence. Four days later, the trial court denied defendant's motion to reconsider. Defendant filed a timely notice of appeal on April 15, 2015.

¶ 21                                                          ANALYSIS

¶ 22        On appeal, defendant asks this court to reverse the felony murder conviction on the grounds that the State failed to prove first degree felony murder beyond a reasonable doubt because the same act formulated the basis for mob action and the killing. Additionally, defendant asserts that trial counsel was ineffective for failing to seek jury instructions on the affirmative defense of self-defense pertaining to the mob action. Defendant requests reversal and remand for a new trial to allow the jury to be instructed on self-defense with regard to the charge of mob action during the earliest phase of the street brawl.

¶ 23        The State contends that defendant was proven guilty of felony murder beyond a reasonable doubt because the forcible felony, mob action, took place during the earliest phase of the street brawl and was independent of the shooting that resulted in the killing necessary to prove felony murder. The State further asserts that defendant received effective assistance of counsel during trial.

¶ 24        In criminal proceedings, the State carries the burden of proving each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). When a challenge to the sufficiency of the evidence arises, reviewing courts must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 25        A person commits first degree murder if, in performing the acts which cause the death of an individual, the person is attempting or committing a forcible felony other than second degree

murder. 720 ILCS 5/9-1(a)(3) (West 2012). In this case, an element of felony murder required the State to prove the victim's death occurred while defendant was committing a forcible felony, mob action.

¶ 26    The statute defining the forcible felony of mob action states that a person commits mob action when he or she engages in: "the knowing or reckless use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law." 720 ILCS 5/25(a)(1) (West 2012). The State's instruction No. 35, as given, clearly instructed the jury that if the jury did not find defendant guilty of mob action, then the jury could not find defendant guilty of felony murder.

¶ 27                                    I. Predicate Forcible Felony

¶ 28    The first issue defendant raised on appeal is whether the offense of mob action may serve as the predicate felony for purposes of this particular felony murder conviction. The case law provides that, under certain circumstances, the offense of mob action may serve as a proper predicate felony for a charge of felony murder based on 720 ILCS 5/9-1(a)(3) (West 2012) as long as the act forming the basis for mob action does not arise from and is not inherent in the act of the murder itself. *People v. Davis*, 213 Ill. 2d 459, 473-74 (2004); *People v. Davison*, 236 Ill. 2d 232, 243 (2010)*; People v. Tamayo*, 2012 IL App (3d) 100361, ¶ 25.

¶ 29    Generally speaking, the acts constituting the underlying forcible felony are considered to be inherent in the killing itself "where the evidence of the conduct underlying the felony and the killing is the same." *Davis*, 213 Ill. 2d at 471. Whether the act supporting the underlying forcible felony was inherent in the act of murder itself or whether the act supporting the underlying forcible felony had an independent felonious purpose are questions of law subject to *de novo* review. *Davison*, 236 Ill. 2d at 239.

9

¶ 30        In this case, the court instructed the jury that the prosecution had to prove the following two propositions, beyond a reasonable doubt, to warrant a guilty verdict for first degree murder: (1) that the defendant or one for whose conduct he was legally responsible performed the acts which caused the death of the victim, and (2) in performing the acts which caused the victim's death, defendant was committing the offense of mob action.

¶ 31        To prove the underlying or predicate offense of mob action necessary to establish felony murder, the State needed only to prove that defendant, without authority of law and while acting with at least one other person, knowingly or recklessly disturbed the public peace by the use of force or violence. See 720 ILCS 5/25-1(a)(1) (West 2012). Here, the State's witnesses, Beck and Singleton, described defendant's conduct when the mob consisted of approximately 10 participants. According to these two eyewitnesses, defendant actively participated in the fight during the very first moments of the disturbance at issue. Based on our careful review of the record, the State's evidence established that while acting with at least one other person, defendant participated in the first stages of the disturbance and proved all the necessary elements of the forcible felony of mob action.

¶ 32        We scrutinize the State's evidence to discern whether the act, namely defendant's early unarmed participation in the fight with others, was the very same act that was inherent in the killing. The evidence reveals that as time passed, the disturbance may have doubled in size. For example, Brock, a passenger in a car that became trapped on the roadway, testified that she saw approximately 20 to 30 people actively fighting in the street. The eyewitness testimony also established that defendant and Marquis stood side-by-side as one of these two men repeatedly pulled the trigger of the gun thereby killing the victim. When Officer Logan arrived at the scene after the shooting, Logan observed 50 to 75 people gathered at the scene.

10

¶ 33    Next, we consider whether the act that resulted in the killing was the same act inherent to defendant's participation in the fight during the first few moments of the street brawl. On one hand, the first degree murder involved the act of someone pulling the trigger of a firearm closer to the time when the fight concluded. For purposes of felony murder, it did not matter whether defendant or someone else discharged the firearm.

¶ 34    On the other hand, the act supporting the mob action involved defendant's earlier actions during his scuffle with Fitzpatrick and another person. One act involved pulling the trigger of a firearm, the other did not. Each act took place at separate times and involved different levels of violence. Therefore, we reject defendant's contention that the mob action arose out of the same conduct that was inherent in the act of the killing itself.

¶ 35                                    II. Independent Felonious Purpose

¶ 36    Reviewing courts must also determine whether the acts comprising the underlying felony mob action involved an independent felonious purpose other than that of the killing. *Davison*, 236 Ill. 2d at 244; *Tamayo*, 2012 IL App (3d) 100361, ¶ 25; *People v. Morgan*, 197 Ill. 2d 404, 458 (2001). When determining whether there was an independent felonious purpose, courts look to whether "the felony murder charge arose from the cause and effect relationship between the predicate felony and the resulting murder." *Tamayo*, 2012 IL App (3d) 100361, ¶ 25; see also *Morgan*, 197 Ill. 2d at 446-47.

¶ 37    Here, it is clear that defendant was initially a participant in a street fight that did not involve lethal force. In fact, the initial phase of the disturbance did not cause a death. Later, someone, either defendant or Marquis, introduced lethal force into the fight presumably to gain an advantage in the ongoing street fight.

11

¶ 38 The evidence, when viewed in the light most favorable to the State, supports the theory that while unarmed, defendant actively participated in the fight with the intent to perpetuate the rapidly growing disturbance of the peace. Thereafter, defendant, together with Marquis, demonstrated a much different and independent purpose by resorting to potentially lethal violence, either as a display of superior force to become the victor or as a form of retaliation against those engaged in the ongoing fight. Consequently, we conclude defendant's acts comprising the underlying felony of mob action involved two very independent felonious purposes.

¶ 39                    III. Break in the Chain of Events/Foreseeability

¶ 40 Next, we consider defendant's argument that that there was a "break in the chain of events between the [predicate] felony and the killing" after defendant retreated to the temporary safety of his home. Under the proximate cause theory of felony murder, liability attaches for any death proximately resulting from the unlawful activity with foreseeability being an essential consideration. *People v. Nash*, 2012 IL App (1st) 093233, ¶ 27.

¶ 41 The case law provides that "[a] felon is liable for those deaths which occur during a felony and which are the foreseeable consequence of his initial criminal acts." *People v. Moore*, 375 Ill. App. 3d 234, 239 (2007). Citing *Moore*, defendant submits his retrieval of a firearm from a nearby location constituted a "break in the chain of events between the felony and the killing" because defendant reached "a place of temporary safety." *Id*. at 241. According to defendant's theory, based on *Moore*, once defendant reached a place of temporary safety inside his home, defendant's participation in the mob action ended. We reject defendant's argument on two grounds. First, *Moore* involved very different circumstances than those in the case at bar. Second, there is no evidence supporting defendant's assertion that he entered his home at all.

12

¶ 42        The circumstances in *Moore* are distinguishable from the facts in this appeal. In *Moore*, the defendant stole a car. See *Id*. at 235. The next day, while driving the stolen car, officers attempted to effectuate a traffic stop on the defendant. *Id*. at 236. The defendant in *Moore* led officers on a chase that resulted in an auto collision and a death. *Id*. The State charged the defendant with first degree felony murder with the underlying felony being the burglary of the stolen car. *Id*. at 235. The jury returned a verdict finding the defendant guilty of first degree murder and burglary. *Id*. at 238.

¶ 43        On appeal, the *Moore* court reversed defendant's conviction because the defendant had enjoyed the use of the stolen vehicle while he was "unmolested" and away from police pursuit for nearly 24 hours before the chase and resulting death. The court held that the defendant reached a temporary place of safety and concluded the defendant's predicate felony offense of burglary to a vehicle was completed before the police chase resulted in a death the next day. *Id*. at 240-43.

¶ 44        Much like the *Moore* court, we consider the decision rendered by the Tennessee Supreme Court in *State v. Pierce*, 23 S.W. 3d 289 (Tenn. 2000) instructive. When determining whether the killing in that case occurred during the perpetration of the predicate felony, the *Pierce* court considered whether the killing and the predicate felony were closely related in time, place, causation, and continuity of action. *Id*. at 294. If the predicate felony and the killing occurred as part of a continuous criminal transaction, the felony murder rule applied. *Id*. at 295.

¶ 45        Defendant argues that his role as a participant in the mob action concluded long before the killing took place. Specifically, defendant argues that once he reached the safety of his home, his participation in the underlying forcible felony ended. On this basis, defendant asserts the State has not established the killing occurred while defendant was simultaneously committing the

13

offense of mob action that was a continuation of an ongoing street brawl that had not come to an end.

¶ 46　　Contrary to defendant's assertions before this court, there is no direct evidence establishing that defendant actually entered his home, the safe haven, at any point in time. Rather, Beck's testimony was based on an assumption that when defendant ran past Beck's home, defendant was running toward the address where defendant resided. Another eyewitness, Embrey, testified that he saw defendant and Marquis standing in their yard, presumably outside the building, that was located a couple of houses down from the fight.[3] Yet, no witness testified that defendant sought or reached a safe haven by going inside his residence.

¶ 47　　At best, the witnesses established defendant ran down the block to some undisclosed location and then reappeared with a firearm, accompanied by Marquis. Defendant's conduct involved continuity of purpose, namely, the acquisition of a loaded weapon to further facilitate defendant's continued participation in a violent brawl. Based on the time, place, causation, and continuity of action, we hold that defendant's decision to run down the block when he acquired a firearm, did not break the chain of events ending his role in the mob action before the killing.

¶ 48　　We must also determine whether the victim's death was a foreseeable consequence of defendant's participation in the events that began with an unlawful fist fight. Defendant argues that "Once [defendant] had the gun, any subsequent crime, be it murder or mob action, would have been not the foreseeable outcome of his original decision to participate in the fight, but a freely-made decision to leave the safety of his home and take revenge." We disagree.

¶ 49　　As this court has previously noted, when a disagreement escalates into a group fight, it "was not unforeseeable that severe injury and death would result." *Tamayo*, 2012 IL App (3d)

---

[3]Embrey's testimony did not indicate how Embrey knew the yard located a few houses down from the brawl belonged to defendant and Marquis.

14

100361, ¶ 22. It is quite foreseeable that when tempers grow hotter during a group fight, someone may obtain and utilize a lethal weapon during the ongoing conflict that attracted curious spectators. Here, from the beginning, "defendant had embarked upon a course of action which was dangerous in character and could reasonably be expected to require the use of force that might result in the death of a human being." (Citation omitted.) *People v. Tate*, 63 Ill. 2d 105, 112 (1976). This is a tale as old as time. Based on the circumstances of this case, the inevitable escalation of the violence during the group fight and the resulting death of either a participant or spectator were very foreseeable consequences.

¶ 50     Based on this record, we conclude defendant did not withdraw from the ongoing disturbance by running down the block and acquiring a firearm from an unknown person or location. Further, we conclude it was foreseeable that death could result when defendant made his original decision to participate in the street fight.

¶ 51     Viewing the evidence in the light most favorable to the State, we conclude the State proved the elements of felony murder beyond a reasonable doubt, including the underlying forcible felony of mob action.

¶ 52                          IV. Ineffective Assistance of Counsel

¶ 53     Lastly, defendant contends that trial counsel was ineffective. Defendant claims defense counsel should have requested the court to give jury instructions on the affirmative defense of self-defense to the mob action. Defendant contends the instruction for self defense was supported by the testimony of one witness indicating that "a bunch of dudes jumped [defendant]" during an argument.

¶ 54     It is well established that accused persons are guaranteed the assistance of competent counsel for their defense. U.S. Const, amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v.*

15

*Washington*, 466 U.S. 668, 685-686 (1984). In order to establish ineffective assistance of counsel, defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 669. "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Morris*, 2013 IL App (1st) 110413, ¶ 74. Courts evaluate any purported deficiencies in the competence of defense counsel by applying an objective standard of competence based on prevailing professional norms. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). The failure to satisfy either prong of the *Strickland* test bars a finding of ineffective assistance of counsel. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24. When determining the adequacy of defendant's legal representation, appellate courts consider the totality of the circumstances. *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 52. This court reviews the legal issue of whether counsel was ineffective *de novo*. *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008).

¶ 55    In this case, defense counsel's decision to forgo a request that the jury be instructed on the affirmative defense of self-defense to mob action did not constitute ineffective assistance of counsel where the request would have been contrary to defendant's position at trial claiming that he did not participate in the brawl at all. Self-defense is an affirmative defense wherein defendant necessarily admits that he or she committed the crime for which he or she is being prosecuted. See 720 ILCS 5/7-1 (West 2012); See 720 ILCS 5/7-14 (West 2012); *People v. Chatman*, 381 Ill. App. 3d 890, 897 (2008). As a matter of trial strategy, it appears defense counsel did not wish to make this admission.

¶ 56    Defense counsel's strategy was expressed in the closing argument when counsel argued that "[defendant] was not the shooter, nor was he his brother's keeper, nor did he participate in a

16

mob action, and he is not guilty of the charges against him." Initially, in an attempt to convince the jury that defendant didn't even participate in the fight, defense counsel pointed out that Embrey's "testimony doesn't tie either [defendant] or Marquis to that fight. There's no mob action there based on what you heard." Part of defense counsel's theory of the case was that defendant did not participate in the brawl on any level. A self-defense instruction is not necessary for an act that a defendant denies committing. *Chatman*, 381 Ill App. 3d at 900. On this basis, a self-defense instruction would have been inappropriate.

¶ 57    However, to the extent that defense counsel went on to argue that the testimony established that if defendant was in the fight, defendant was jumped, and was defending himself, we conclude that the result of the proceeding would not have been different had a self-defense instruction been posed to the jury. Here, the jury was instructed that "A person commits the offense of Mob Action when he acting together with one or more persons and without authority of law knowingly disturbs the public peace by the use of force or violence."

¶ 58    Had the jury been instructed on the affirmative defense of self-defense, the instruction would likely have stated "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [(himself) (another)] against the imminent use of unlawful force." Illinois Pattern Jury Instructions, Criminal, No. 24-25.06. However, the jury found defendant guilty of mob action in this case, and in doing so, necessarily found that defendant did so "without authority of law." Therefore, we cannot say the outcome of the trial could have been different had a self-defense instruction been offered because the jury already found that defendant acted without authority of law.

¶ 59    For the above reasons, defendant did not receive ineffective assistance of counsel and we affirm defendant's convictions.

17

CONCLUSION

¶ 61       The judgment of the circuit court of Peoria County is affirmed.

¶ 62       Affirmed.

¶ 63       JUSTICE McDADE, dissenting.

¶ 64       Michael Costic killed a man. He took the life of Treyshawn Blakely and injured Gerald Embrey when he or his brother, acting by agreement, shot a gun repeatedly and randomly into a crowd of people, seemingly in a fit of pique. So said the jury at the end of his trial when it found him guilty of first degree felony murder. So agreed the trial court when it entered the verdict of felony murder and sentenced him to 50 years for Blakely's death. And so concludes the majority as it upholds the conviction of felony murder in this appeal.

¶ 65       Not so, says Costic. He has appealed, alleging that the State failed to prove him guilty of felony murder. I agree with the defendant that the State has failed to carry its burden and, for the reasons that follow, I believe defendant's conviction must be reversed. I respectfully dissent from the majority decision that affirms that conviction.

¶ 66       As I have picked my way through the myriad details of this case that have led three judges applying the same facts and the same law to reach diametrically opposite conclusions, I have envisioned people outside of the justice system, and likely some within it as well, saying, "Treyshawn Blakely is dead; this defendant pulled the trigger; he was found guilty and now he is in prison where he should be. What's the big deal?" And if Costic's conviction were to be reversed as I think it must be, many people who read the decision or hear about it will utter that most damning of opinions, "the court let him go on a 'technicality.' "

¶ 67       Those people would be wrong. If his conviction were to be reversed it would be on the basis of the most fundamental tenet of our criminal justice system: no person charged with a

18

crime should be deprived of life or liberty unless the State proves him/her guilty, beyond a reasonable doubt, not of any crime but of the crime with which it has chosen to charge him. Striving to determine if the State has sustained that burden is not an exercise in technical nit-picking, no matter how much it may appear to be just that.

¶ 68        The General Assembly has, by statute, given Illinois prosecutors a smorgasbord of ways to charge one person with the death of another. Specifically, relevant to this case, it has given prosecutors three ways to charge first degree murder: acting with the intent or the sure knowledge that your action(s) will kill or cause great bodily harm; acting recklessly knowing there is a strong probability that your actions will kill or cause great bodily harm; and causing the death of another while engaged in the commission of a felony. In addition to these choices, prosecutors have also been granted complete discretion to choose the offense(s) with which they elect to charge the defendant and they are immunized against any liability for the way in which they exercise that discretion. There is, nonetheless, a cost to that choice in that, in making it, the prosecutor has eliminated all options not chosen and has prescribed what he or she is now obligated to prove to secure a conviction. In this prosecution of Michael Costic, the Peoria County State's Attorney chose to pursue only the third variant of first degree murder: felony murder.

¶ 69        Our supreme court has voiced its disquiet with felony murder and its potential for abuse by prosecutors and it has alerted the trial and appellate courts to the need to exercise care to ensure that it is properly proven. In *People v. Davison*, 236 Ill. 2d 232 (2010), Justice Kilbride,

writing for an essentially unanimous court[4], discussed the court's fundamental concerns about the risks of felony murder as a basis for first degree murder convictions.

"The offense of felony murder is unique because it does not require the State to prove the intent to kill, distinguishing it from other forms of first degree murder when the State must prove either an intentional killing or a knowing killing." *People v. Davis*, 213 Ill. 2d 459, 471 (2004) (citing 720 ILCS 5/9-1(a)(1), (2) (West 2002)). "Because of this distinction, this court has repeatedly expressed our view that a felony-murder charge may, in effect, improperly allow the State to both eliminate the offense of second degree murder and avoid the burden of proving an intentional or knowing first degree murder because many murders are accompanied by certain predicate felonies." *Davis*, 213 Ill. 2d at 471 (citing *People v. Morgan*, 197 Ill. 2d 404, 447 (2001) and *People v. Pelt*, 207 Ill. 2d 434, 441 (2003)).

"Addressing that view, this court has concluded that 'where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder.' *Morgan*, 197 Ill. 2d at 447. Consequently, in *Morgan*, we rejected felony-murder charges predicated on the forcible felonies of aggravated battery and

---

[4]Justice Garman, joined by Justice Burke, specially concurred to call attention to an issue in felony murder analysis that remains unresolved but that had no impact on the outcome of the case then under consideration. It may be a relevant consideration in this case.

aggravated discharge of a firearm for a 14-year-old defendant who fatally shot his grandfather and grandmother because those felonies were inherent in, and arose from, the fatal shootings. The *Morgan* court explained it was arguable that the murders gave rise to the predicate felonies, rather than the predicate felonies resulting in the murders. The *Morgan* court also held that the predicate felony underlying a charge of felony murder must have an independent felonious purpose. *Morgan*, 197 Ill. 2d at 458."

¶ 70 I believe a reasonable characterization of the gist of this explanation is that the State must prove that the death at issue was an *unintended consequence* of the predicate felony. It is unintended because it was not the perpetrator's purpose or intent to kill but rather to further a different, independent felonious goal. And it is a consequence because the death must result from the predicate felony; the converse will not suffice.

¶ 71 Applying these general principles to the instant case, I would find, unlike the majority, that no variation of the claim of mob action offered by the prosecution in this case provides evidentiary support for, and certainly not proof beyond a reasonable doubt of, the State's charge of felony murder. Indeed, I believe this case lends compelling substance to the specific concerns expressed by the *Davison* court.

¶ 72 In a nutshell, the events culminating in defendant's conviction began with an argument involving approximately ten people, including defendant. It devolved into a street fight when several of the people arguing began throwing punches. The evidence presented by the State appears to show that the defendant was neither an instigator of nor an active participant in this devolution. Indeed, Dishai Beck and Cynthia Williams (referred to by the majority as Singleton),

21

who were the only trial witnesses who observed the incident from its inception, testified at trial that Costic had been jumped ("a bunch of dudes jumped [defendant]") and struck by several people at once, was beaten and had sustained injuries. The State notes in its appellate brief that Beck described Costic as defending himself. Both women further testified that at this point defendant ran away from the fight; they both assumed he was going to his home down the block.

¶ 73     And, in fact, Gerald Embry observed defendant at his house, talking with his brother out in the yard. Neither of them was in possession of a gun when he saw them. A little later, defendant and his brother walked back to the area of the original fight with one of them carrying "a big gun." While there was some dispute among the witnesses about which brother actually had it in hand, the weight of the testimony seems to point to it being defendant who was holding and shooting the gun. Defendant did not join the brawl, did not engage in hand-to-hand fighting, nor had he brought a weapon to the scene suitable for inflicting greater injury in a hand-to-hand conflict, such as a knife, brass knuckles, a sap, etc. Instead he began randomly shooting the gun into the crowd, ultimately injuring Embry and killing Blakely.

¶ 74     The State charged defendant with first degree murder on only one basis—felony murder while committing mob action under section 9-1(a)(3) of the Criminal Code of 2012 (the Code) (720 ILCS 5/9-1(a)(3) (West 2012)), which provides:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, *in performing the acts which cause the death*:
>
> * * *
>
> (3) he is attempting or committing a forcible felony other than second degree murder." (Emphasis added.) *Id.*

22

¶ 75    The predicate forcible felony alleged was mob action, a Class 4 felony, pursuant to section 25-1(a)(1) of the Code (720 ILCS 5/25-1(a)(1) (West 2012)), which provides:

> "(a) A person commits mob action when he or she engages in any of the following:
>
> (1) the knowing or reckless use of force or violence disturbing the public peace *by 2 or more persons acting together* and without authority of law." (Emphasis added.) *Id.*

¶ 76    Turning once again to *Davison*, the State's decision to charge felony murder obligated it to prove, beyond a reasonable doubt, that Costic's acts of arming himself and shooting his loaded gun into a crowd of people locked together in hand-to-hand battle had a felonious purpose *other than* (1) the intent or knowledge that his acts will kill or do great bodily harm (720 ILCS 5/9-1(a)(1) (West 2012)) or (2) to shoot with knowledge that his acts create a strong probability of death or great bodily harm. (720 ILCS 5/9-1(a)(2) (2012)). The State's choice of how to frame mob action as the predicate felony also obligated it to prove that defendant's purpose was some undefined relationship between the use of force or violence and disturbing the peace. This second requirement leads to my first significant problem with this case.

¶ 77                    I. Absence of Statutory Statement of Purpose or Intent

¶ 78    Subsection (1) of the mob action statute, which the State elected to charge, has no express or clearly implied intent or purpose. 720 ILCS 5/25-1(a)(1) (West 2012). We are left to speculate whether disturbing the peace is a purpose or intent, a necessary result, or merely an incidental by-product of the use of force or violence undertaken for some other unspecified purpose. By contrast, subsection (2) of the mob action statute requires "the knowing assembly of 2 or more

23

persons with the intent to commit or facilitate the commission of a felony or misdemeanor." 720 ILCS 5/25-1(a)(2) (West 2012). Subsection (3) has two purposes: "the knowing assembly of 2 or more persons, without authority of law, for the purpose of doing violence to the person or property of anyone supposed to have been guilty of a violation of the law, or for the purpose of exercising correctional powers or regulative powers over any person by violence." 720 ILCS 5/25-1(a)(3) (West 2012). The omission of an intent or purpose from subsection (1) leaves a defendant without a clear offense or a clear mental state to defend against and leaves the State free to present the felonious purpose as a constantly moving target.

¶ 79    And that appears to be precisely what happened here. The State posited two (or possibly three) iterations of mob action in this case. The first was the "street fight" itself that began at the corner of Butler and Warren Streets and continued unabated through the shooting; the second was solely the act of the two brothers, one of whom was armed, going together to the scene of the ongoing street fight, with what the State speculated were several possible purposes; and the third appears to be a single action involving some combination of the first and second with those same speculative purposes.

¶ 80    Although it is not totally clear to me, the majority appears to have opted for the first variant as the operative mob violence. Its initial finding was, "[b]ased on our careful review of the record, the State's evidence established that while acting with at least one other person, defendant participated in the first stages of the disturbance and proved all the necessary elements of the forcible felony of mob action." *Supra* ¶ 31. The majority goes on to show the street fight continued even after defendant retreated to his home and returned to the scene of the fight, shooting indiscriminately, and it concludes the shooting was part of that "mob action."

24

¶ 81 I believe, and would find, that the use of subsection (1) as the applicable version of mob action actually impedes the State's ability to prove Costic guilty of felony murder in this case because the act of force or violence alleged and the only such act in which defendant was engaged at the time Blakely was killed—the act of shooting the gun into the crowd—is inherent in the act of murder. *Davis*, 213 Ill. 2d at 471 ("the evidence of the conduct underlying the felony and the killing is the same"). Moreover, if subsection (1) is found to have a clearly articulated or clearly implied felonious purpose or intent, it appears that purpose would likely be disturbance of the public peace. The language of subsection (1) does not lend itself to construing or implying any other purpose for the knowing or reckless use of force or violence. And, indeed, the majority has at least implicitly so found, stating "the State needed only to prove that defendant, without authority of law and while acting with at least one other person, knowingly or recklessly disturbed the public peace by the use of force or violence" (*supra* ¶ 31).

¶ 82 Thus, assuming the majority's finding is correct, the State has taken on the dual burden of proving the highly unlikely proposition that when the Costic brothers went together to the scene of the street fight and one of them raised the loaded gun and fired multiple bullets into the crowd he did so (a) with the singular purpose of violently disturbing the public peace and (b) *not* with the purpose or probability of killing someone. As will be shown, the State has failed to do so and defendant's felony-murder conviction must be reversed on that basis.

¶ 83                                        II. Absence of Evidence Proving Elements of Mob Action

¶ 84 The second major problem I have with the majority decision is the dearth of evidence necessary to prove the elements of the predicate offense. Turning again to *Morgan* and *Davison,* the supreme court has made it clear, and the mob action statute confirms, that proof of a defendant's ongoing predicate felony with an independent felonious purpose is critical to proving

25

felony murder. Stated differently, the State must prove defendant was currently involved in the actions of the predicate felony and with the purpose of committing that felony. The State's burden is complicated in this case because, unlike the typical felony-murder prosecution, the predicate felony alleged did not take place seamlessly. Because defendant went home in the middle of the claimed mob action, the State was obligated to prove defendant was committing the predicate offense and harbored the independent felonious intent at both ends of the alleged offense and did not intend for or recognize a probability that his actions would kill or cause great bodily harm that could cause death. In that regard, I find three essential failures of proof by the State in this case.

¶ 85        A. Was Defendant an Actual Participant in the Early Stages of Mob Action?

¶ 86        The majority's first finding with regard to its conclusion is that "[t]he State's evidence established that while acting with at least one other person defendant participated in the first stages of the disturbance and proved all the necessary elements of the forcible felony of mob action." *Supra* ¶ 31. Contrary to that specific finding, the State did not prove that defendant ever participated in "the very first moments" or "the first stages" of the alleged mob action. The elements of the form of mob action charged by the State in this case are that the defendant, acting together with one or more other persons, engaged in the knowing or reckless use of force or violence that disturbed the public peace. Pertinent to this issue, the evidence produced at trial showed that defendant was involved in an argument, which is not forcible or violent conduct, that changed into something else when he was physically attacked by some of the other participants in the argument. I have seen no evidence produced by the State that showed defendant was "acting together" with any other person to change the incident from legal, if heated, discussion to illegal force or violence. The State's two eyewitnesses described defendant

26

being jumped and attacked and defending himself, and further described him as injured and running from the scene.

¶ 87    The only reasonable inference from that fact testimony presented by the State is that defendant was *not,* at the time of or after the introduction of force or violence, "acting together" with his attackers in the knowing or reckless use of force or violence. Even a showing that he struck out at one or more of the persons who attacked him cannot, standing alone, support a reasonable inference that he was "acting together" with them for any purpose. But the State presented no additional facts, direct or indirect, that would compel, or even support, the contrary and essential inference that defendant was acting together or in concert with his attackers to use force or violence for the purpose of disturbing the public peace or any other felonious purpose. Thus, the State has failed to prove defendant participated in mob action prior to retreating to his home.

¶ 88        B. Was Defendant Participating in Mob Action upon His Return to the Scene?

¶ 89    Second, the State failed to present any evidence that defendant was a participant in the ongoing mob action when, after leaving the fight and retreating to his home, he returned to the scene with his brother. Even if defendant had been part of the early stage of the mob action event, there is no evidence that he was participating in the event upon his return to the site.

¶ 90    The majority appears to be using escalating numbers of participants and bystanders in the area of the fight to confirm the continuation of the mob violence and the actual disturbance of the peace. The effectiveness of this use of numbers to prove the necessary point is problematic. The question is not whether the offense was ongoing but whether defendant was actively engaged in it. The statutes defining the particular form of felony murder alleged here make that clear. The first degree murder statute requires that a defendant be "attempting or committing a forcible

27

felony other than second degree murder" while "performing the acts which cause the death." 720 ILCS 5/9-1(a)(3) (West 2012). The mob action statute defines the offense as "engag[ing] in" the "knowing or reckless use of force or violence." 720 ILCS 25-1(a)(1) (West 2012). It is, therefore, insufficient to show the action is going on without persuasive evidence that defendant's intent is to participate in it with the purpose of disturbing the public peace or whatever the proven felonious intent is. The State has produced no evidence that defendant harbored any purpose at the time he fired the shots other than the obvious one of killing or causing great bodily harm. In fact, the State has produced no evidence at all of defendant's purpose or intent at any stage of the events. I believe *Davison* and *Morgan* make clear that without such a showing, the felony-murder conviction stands unproven. Moreover, without some evidence, some *facts* on which to base a reasonable inference of a different purpose, the felony-murder conviction is grounded entirely in speculation, which is not proof beyond a reasonable doubt.

¶ 91     I do not find any factual support in the State's evidence for a reasonable inference or conclusion by the majority that defendant was a culpable participant in the forcible mob-action felony described by the majority at the shooting stage of the events in this case.

¶ 92          C. Did Defendant Have an Independent Felonious Purpose?

¶ 93     Despite this failure of evidence of defendant's participation in the initial and later stages of the described mob action, the majority still goes on to consider "whether the act, namely defendant's early unarmed participation in the fight with others, was the very same act that was inherent in the killing." As part of its consideration, the majority appears to conclude, without the benefit of any discernible evidence, that even though defendant had left the scene of the original alleged mob action without ever having participated in it, his return was still for the elusive mob-

28

action purpose—a conclusion that flies in the face of the preeminently reasonable, arguably compelling, inference that someone who approaches a crowd indiscriminately firing a loaded gun into that crowd is intending to injure or kill. As untenable as the majority's conclusion may be, it is nonetheless essential to its finding that the State has proven a fundamental element of felony murder—specifically, that defendant's purpose, his sole felonious intent while he was recklessly discharging bullets from his loaded gun into a massed crowd of people and injuring Embry and killing Blakely was not to injure or kill but merely to use force or violence with the intent to disturb the peace or for a different, nebulous felonious purpose, thereby disturbing the peace. As noted, the State presented no *evidence* of such an intent and the obvious and reasonable inference from the facts the State *did* present is that defendant's intent was to cause great bodily harm or to kill.

¶ 94                  III. Lack of Coherent, Consistent Theory and Narrative

¶ 95       The third major problem I have with the affirmance of this conviction derives from the fact that the case presented to the jury was incoherent and lacking in factual and legal consistency. This casts serious doubt on the legitimacy and reliability of the jury's verdict. The jury had to find that Costic was guilty of felony murder and not simply that he killed Blakely. This required the State to present a clear and consistent theory and narrative and actual evidence to support a conclusion that the jury found Costic guilty of felony murder beyond a reasonable doubt. The case constructed by the State was long on supposition, long on rhetoric, and woefully short of essential evidence. The State argued at least two theories of what conduct constituted the underlying felony and what defendant intended to achieve by that conduct (his purpose).

¶ 96       This incoherence and inconsistency are clearly shown in the State's closing argument. I acknowledge here at the outset that closing argument is not evidence. See, *e.g.*, *People v.*

*Hattery*, 109 Ill. 2d 449, 463 (1985). But closing argument *does* frame the issues for the jury and organize the evidence to show how it supports or refutes the legal proposition the party is urging the jury to accept. In this case the State vacillated between two versions of the mob action, *neither of which, in my opinion, works.*

¶ 97　　The first version, of course, is the one that the majority has adopted as its basis for affirming defendant's conviction. I believe that I have amply demonstrated that the State has not produced any evidence to support its contention that defendant was a culpable participant at either stage of the mob action as the State alleged it occurred. Nor has the State produced any *facts* that would support a reasonable inference that defendant was acting to achieve any purpose other than the one that springs immediately and forcefully to mind when a person shoots 21 rapid-fire shots from a gun into a roiling crowd of people.

¶ 98　　The State's second version of the mob action is even more problematic. In its argument on defendant's motion for directed verdict, the State implied a different mob action in which Michael and Marquis were the two persons—required for mob action under the statute—and that their actions had a different purpose than that of the original mob action. The State suggested a spin-off mob action in which the purpose or intent was "to send a message, a violent terrifying message." The essence of the argument was:

　　　　"They were sending that group of males who had jumped

　　　　them a message. They didn't go back there with the specific intent

　　　　to kill any particular individual, but unquestionably not the two

　　　　people that got shot. I don't think anyone is suggesting that they

　　　　intended that. Murder was not on their minds. I would say

　　　　indifference to murder was essentially the scenario. They went

30

there to send a message, a violent, terrifying message. And again, that's exactly what mob action is."

¶ 99    The trial court denied the motion finding the issues of requisite felonious intent or purpose to be "interesting," but found evidence presented by the State could show "a felonious purpose separate and apart from the murder itself." The court concluded "the indication that Michael was getting the worst end of the fight, left, returned, *** indicates that they were returning for the purpose of participating in the mob action."

¶ 100    Having succeeded in this argument of a second mob action once, the State used it again, this time with the jury. After making an initial argument that the subject mob action was the original and continuing street brawl—the mob action found by the majority—the State pivoted to its new mob action with its new and different purpose, with an occasional oblique nod to the original mob action.

"And when they open up [begin shooting], what was the purpose? [Incorrect statement of law.] They did not I submit to you intend to kill anyone specific. They did not have a specific target in mind. It was not intentional or knowing murder. I would submit to you at best they were indifferent on the subject of whether or not they killed anybody. I don't think they gave a damn. They opened up on a group of people. If somebody got hit, they got killed, so be it, but that wasn't the point. The point, the intent was a textbook continuation of a mob action. The use of force, in this case as

31

extreme a type of force as you can get, assault rifle, if not fully automatic, semiautomatic."

¶ 101    The prosecutor then set out the case for the statutory elements of the use of force and the disturbance of the public peace and then moved on to intent:

> "And the intent, the purpose was to send a message to that other group. Whether they hit some of them, sure, why not? Or if they hit somebody that had nothing to do with it—Treyshawn Blakely, Gerald Embrey—they didn't care. The point was they were sending a message to that other group. 'You don't do this in my neighborhood, and if you do, this is what happens. They were terrorizing. They were intimidating. Mob action. They committed together mob action."

¶ 102    Considering these arguments made by the State, there are several things that seem clear to me. First, the State has defined the applicable mob action conduct as Michael and Marquis going together to the area where the street fight is continuing, armed with the gun, and shooting into the crowd ("They opened up on a group of people. If somebody got hit, they got killed so be it ***." "This isn't a crossfire. It wasn't a shootout. It was a massacre. He opened upon a crowd of people unilaterally, he or his brother."). The State identified the force or violence element of the alleged mob action ("The use of force, in this case as extreme a type of force as you can get, assault rifle, if not fully automatic, semiautomatic. I mean 21, 21 rapid fire shots into a group of people. That's force. That's a use of force, and it actually was demonstrated in that Gerald Embrey was

32

struck…Treyshawn Blakely was struck. The result of the force was described to you."). The element of disturbance of the public peace was described ("And was the public peace disturbed by that? Everyone you heard from that saw that, saw Treyshawn Blakely go down; heard shots fired, saw shots fired at a group of people. I mean, if that didn't disturb the peace, then there's not behavior capable of doing so, I would submit to you. Of course it did. That is a textbook mob action."). Because, *as defined by the State*, the evidence of the *conduct* underlying the felony and the killing is the same, the felony in this case is inherent in the act of murder and the felony murder conviction cannot stand. *Davis*, 213 Ill. 2d at 471.

¶ 103    Second, the State appears to have determined that the conduct constituting this version of the alleged mob action was a *response* to the first, not part of it. In arguing that the purpose or intent of the predicate mob action was something other than to kill or cause great bodily harm, the State contended in response to the motion for directed verdict that the brothers went to the scene of the street fight to

> "send[ ] that group of males who had jumped them a message. They didn't go back there with the specific intent to kill any particular individual, but unquestionably not the two people that got shot. *** Murder was not on their minds. I would say indifference to murder was essentially the scenario. They went there to send a message, a violent, terrifying message."

Later, the State argued to the jury that

"The intent, the purpose was to send a message to that other group. Whether they hit some of them, sure, why not? Or if they hit somebody that nothing to do with it...they didn't care. The point was they were sending a message to that other group, *'You don't do this in my neighborhood and if you do, this is what happens.'*" (Emphasis added.)

¶ 104 Even if we overlook the fact that the State is advancing arguments that appear inconsistent with the known facts and if we ignore the fact that the prosecutor cites no testimony or other evidence in support of the arguments and seems to be testifying and if we accept the assertions at face value; we are still left with the questions: What is the terrifying and intimidating message? and What is the "this" that will happen? And looking at the *facts* before us, the inescapable answer would be: "We will shoot at you and possibly kill you." To send that message, they had to do it. As set out by the State, the killing was not an unintended consequence, it was the subject of the message they intended to send.

¶ 105 In summary, I do not believe the State has met its burden of proving Michael Costic guilty beyond a reasonable doubt of felony murder. First, the section of the mob action statute under which he was charged does not contain a discernible purpose, making the critical determination of whether he had the mob action purpose rather than a homicidal purpose at the time he pulled the trigger exceedingly problematic. Second, the State presented no evidence that Costic participated in either the early or later stages of the mob action posited in one of its theories and the *facts* recited by the State's witnesses support only one

reasonable inference—that he was not a culpable participant. Third, under the State's second theory—the one it presented most forcefully and persuasively—there are three major problems: (1) the alleged mob action was inherent in and arose from the fatal shooting—that is to say, if the felonious purpose was to send a "violent and terrifying message" the shooting had to occur and ideally someone had to sustain life-threatening injury or to die; (2) the fact that sending the message and doing the shooting constituted the same action with the same purpose appears to foreclose the possibility of finding an independent felonious purpose; and (3) the reckless and repeated discharge of a firearm into a milling crowd knowing that those acts create a strong probability of death or great bodily harm constitutes the second form of first degree murder (720 ILCS 5/9-1(a)(2) (West 2012) and obviates felony murder.

¶ 106     This case perfectly exemplifies the concerns and fully justifies the reservations expressed by the supreme court in *Davison.* I believe Costic's conviction of felony murder must be reversed.